Tracey BURNSTEIN, Plaintiff,

v.

SAKS FIFTH AVENUE & CO. and McRae's, Inc., Defendants.

No. 01–72079.

United States District Court,
E.D. Michigan,
Southern Division.

June 27, 2002.

Patrick L. McCarley, Southfield, MI, for plaintiff.

Kenneth A. Rich, Farmington Hills, MI, for defendant.

## OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. *INTRODUCTION*

Plaintiff Tracey Burnstein commenced this suit on June 1, 2001, alleging that Defendants Saks Fifth Avenue & Co. and McRae's, Inc.,[1] violated the federal Fair

---

1. Plaintiff's initial complaint named Saks Fifth Avenue as the sole Defendant. In the course of discovery, however, Plaintiff learned that Saks Fifth Avenue is a wholly-owned subsidiary of McRae's, and Plaintiff has filed an amended complaint naming both of these corporations as Defendants. Because the theory of liability is the same as to both Defendants, the remainder of this Opinion refers to them jointly as "Defendant."

Credit Billing Act ("FCBA"), 15 U.S.C. § 1666 *et seq.*, by failing to appropriately respond to and correct a purported double-billing error identified by Plaintiff, and by reporting Plaintiff's account to a credit bureau as delinquent despite the disputed status of this account. This Court's subject matter jurisdiction rests upon Plaintiff's assertion of claims arising under federal law. *See* 28 U.S.C. § 1331.

By motion filed on November 7, 2001, Defendant now seeks summary judgment in its favor on Plaintiff's claims under the FCBA. In support of this motion, Defendant argues: (i) that Plaintiff's claims are time-barred under the governing one-year statute of limitations; (ii) that Plaintiff did not give sufficient notice of a purported billing error to trigger Defendant's obligations under the FCBA; and (iii) that Plaintiff has failed to produce sufficient evidence of any actual damages she suffered as a result of any alleged violation. Plaintiff filed an untimely response to this motion on February 11, 2002, and Defendant submitted a reply brief in further support of its motion on February 25, 2002.

On June 13, 2002, the Court met with counsel in its chambers regarding Defendant's motion. Having reviewed the parties' briefs and supporting exhibits, and having considered the statements of counsel at the June 13 conference, the Court is now prepared to rule on this motion. This Opinion and Order sets forth the Court's rulings.

## II. *FACTUAL BACKGROUND*

For purposes of Defendant's motion, the relevant facts are straightforward and largely undisputed. This case concerns two Saks Fifth Avenue credit card accounts held by Plaintiff. The first, number 21–091–483, was opened by Plaintiff under her maiden name, Tracey Ellen Conn. The second, number 1002–005–849, is held by Plaintiff under her married name, Tracey E. Burnstein. Plaintiff has testified that she discontinued her use of the first of these accounts and attempted to close this account in 1996, when she got married and opened the second account. Defendant maintains, however, that its records reflect several purchases and payments made by Plaintiff under her maiden-name account between 1997 and 1999.[2]

Plaintiff first identified a purported billing error in these accounts upon receiving a statement for each of these accounts in December of 1999. The statement for the maiden-name account apparently was mailed to the home of Plaintiff's parents, where she had lived prior to her marriage, while the statement for the other account was mailed to her current address.[3] Upon comparing these two statements, Plaintiff discovered that they included some similar entries, giving rise to a suspicion of double billing of the same purchases to both her maiden-name and her married-name accounts. Specifically, the maiden-name account statement reflected a November 12, 1999 purchase of "Catalog Jackets" in the amount of $445.00, and a November 14, 1999 purchase of "Catalog Pants" in the amount of $295.00, (Plaintiff's Response, Ex. A); while the married-name account included an October 31, 1999 entry for "Ellen Tracy Spt" in the amount of $445.00, and another October 31, 1999 purchase also labeled "Ellen Tracy Spt" in the

**2.** Defendant, however, has not offered any record evidence of any such purchases or payments prior to December of 1999.

**3.** Plaintiff testified at her deposition that she was not aware of any other statements having been mailed to her parents' address at any time between 1996 and December of 1999. The December 1999 statement for the maiden-name account, however, shows both a prior balance and additional purchases.

amount of $295.00, (Plaintiff's Response, Ex. B).[4] Apart from these duplicative amounts, Plaintiff also noted that the last of these entries reflected a New York point of purchase, while she had not been in New York on that date.

Based on these concerns, Plaintiff contacted Defendant's customer service department on December 29, 1999, and spoke to an individual named "Shelby."[5] This individual reportedly responded that Defendant had been experiencing computer problems due to the impending "Y2K" situation and a transition to a new computer system, and that it was possible that Plaintiff had been the victim of double-billing dating back to 1996, when she had opened her married-name account. Accordingly, Plaintiff was advised that her maiden-name account would be closed,[6] that the other account would be placed in "disputed" status, and that a supervisor would contact her to further address the situation. One of Defendant's customer service representatives called Plaintiff within the next day or two, and told her that a supervisor would follow up on the matter after the "Y2K" transition was complete.

When Plaintiff did not hear from anyone over the next two weeks, she sent a letter to Defendant's customer service department on January 15, 2000, outlining the nature of her complaint. This letter stated in part:

· I am writing you this letter as a "MAJOR" problem for the account(s) listed above was discovered on or about December 29th 1999. To date I have not received a response from Saks although I should have and was informed I would.

The problem:

I received a statement for monies owed to Saks listing the wrong address and wrong legal name. That name and address had been changed four years ago. That account number: 21–091–483.

The correct legal name and billing address is listed with the corresponding account number of: 1002–005–849.

It was also discovered that Saks Fifth Avenue had been double billing these accounts for four years. As on statement(s) the same amount had showed up on both accounts as already referenced.

\* \* \* \* \* \*

It was not until December that both Saks and myself realized the full scope of the problem. Additionally, I was informed by 'Janet' in your credit department . . . that one of the supervisors . . . would contact me. To date this has not been done.

As you are aware, I made sure and received confirmation that Account: 21–091–483 has definitely been closed. This does not clear up the problem with your double billing my accounts over the past four years . . . and Saks Supervisors have not called me to assist in clearing up the mess that you have created.

Therefore, I am NOT paying the balance on my Saks Account N[o]: 1002–

---

**4.** In addition, Defendant has produced the second page of the December, 1999 statement for the married-name account, which reflects still another "Ellen Tracy Spt" purchase in the amount of $295.00, this one dated November 11, 1999. (Defendant's Motion, Ex. 2.) This same page shows three credits that perhaps bear upon the parties' dispute: (i) an "Ellen Tracy Spt" credit in the amount of $295.00, dated November 20, 1999; and (ii) two "Catalog Mdse" credits of $295.00 and

$495.00, both dated November 24, 1999. (*Id.*)

**5.** Defendant apparently has been unable to identify anyone named "Shelby" in its customer service or collections departments.

**6.** That same day, Defendant sent a notice to Plaintiff confirming that the maiden-name account had been closed. (*See* Defendant's Motion, Ex. 4.)

005–849 until this is cleared up. It is my belief that Saks owes me money....

\*      \*      \*      \*      \*      \*

PS. I am not enclosing my documentation at this time, as I have already faxed information into Saks on December 29th, 12:10 p[.m] to Shelby.... On December 29th I had to make three telephone calls into Saks to find out what was going on. It was not until I spoke to Shelby that she assisted in correcting this problem and staying on the line with me while 'Janet' was contacted. Janet made sure that the other account had been closed immediately. Both women were apologetic and helpful up to the point that they could assist that day. This does not eliminate ... monies owed ... and double billings.

(Defendant's Motion, Ex. 5.)

Plaintiff's next contact with Defendant occurred on March 13, 2000, when she received a telephone call from Tom Kelly in Defendant's collections department. Kelly advised Plaintiff that her account had been placed into collections as a result of her failure to make her required payments.[7] Plaintiff protested that her account should not have been placed into collections, in light of its disputed status, and she sent a copy of her January 15 letter to Kelly as confirmation of this unresolved dispute. This letter apparently was accompanied by a handwritten note in which Plaintiff stated that she was still waiting to be contacted by a supervisor, as promised during her conversations in De-cember of 1999 with Defendant's customer service representatives.

Plaintiff apparently sent Kelly a similar note on April 21, 2000, again indicating that Defendant had not yet contacted her regarding her double-billing claim. In addition, Plaintiff testified at her deposition that she corresponded with Kelly a third time on May 25, 2000, once again stating that the account was disputed, and indicating, apparently for the first time, that the amount in dispute was $4,000.[8] This amount, according to Plaintiff, most likely reflected the amount stated as owed under the most recent bill she had received from Defendant, thereby indicating her intent to dispute the entire account balance until Defendant provided her with sufficient documentation to enable her to precisely determine the extent of the alleged double-billing error.

It was not until several months later, in October of 2000, that Defendant provided a written response to Plaintiff's double-billing claim. Specifically, on October 11, 2000, account representative Maria Cobar wrote to Plaintiff,[9] extending her "sincere apology that you have found it necessary to inquire several times regarding this matter," but stating that, after considerable investigation, she could "not find any evidence that you have been double billed for any items." (Defendant's Motion, Ex. 6.) Cobar requested Plaintiff's "assistance to help me understand and identify what billing problems you feel occurred on your account," and asked that Plaintiff "[p]lease

---

7. Defendant states in its brief that its policy calls for delinquent accounts to be placed into collections after two months of nonpayment.

8. None of Plaintiff's correspondence with Kelly has been placed into the record before this Court, but Plaintiff discussed each of her letters to Kelly at her deposition. (*See* Defendant's Motion, Ex. 3, Plaintiff's Dep. at 46–52.)

9. Although this was the first written correspondence from Cobar to Plaintiff, the two apparently had spoken on the telephone on one or more occasions, and Plaintiff apparently had sent a number of faxes to Cobar in September and October.

review the enclosed statements and let me know immediately where you feel a billing error may have occurred." (*Id.*) Cobar further advised Plaintiff that Defendant would "put the balance in dispute for the next 30 days," but that "[a]t the end of this time, if we have not heard from you, we will assume your balance is accurate." (*Id.*)

Plaintiff did not respond favorably to Cobar's letter. Rather, in an October 16, 2000 letter, she stated that "[t]his first response from Saks in ten months is ... written in a tone to harass me," that she was "trouble[d]" by Defendant's "inability to understand the Federal laws in place that we all must live by," and that, by her count, Defendant had committed nine violations of this federal law. (Defendant's Motion, Ex. 5.) Plaintiff also opined that Defendant's response was triggered by her filing of a complaint with the Federal Trade Commission. Regarding Cobar's request that Plaintiff more specifically identify any alleged billing errors, Plaintiff cited her prior correspondence and telephone calls, and further stated her view that "I owe Saks nothing and you owe me hundreds of thousands of dollars which may go to triple damages." (*Id.*) Finally, Plaintiff advised Defendant to "contact my Attorney for settlement," and she warned that "if a settlement is not negotiated by the 18th [of] October, I will go forward with a lawsuit against Saks Fifth Avenue." (*Id.*)

Defendant's next written communication to Plaintiff occurred on November 1, 2000, in the form of a letter from its collection manager, Sherrie, Katauskas. Katauskas stated that she had been unable to reach Plaintiff's attorney, but that, "[i]n order to expedite the resolution of your dispute, I am now proposing a settlement of the account." (Defendant's Motion, Ex. 6.) Katauskas noted that the outstanding balance of Plaintiff's account "has already been reduced by a $1136.40 credit applied in September, 2000 to help resolve the dispute," and she proposed that Plaintiff pay 85 percent of the remaining balance, or $2803.30, in a lump sum within 30 days. (*Id.*) Katauskas also offered to delete the notice of settlement that ordinarily would appear in Plaintiff's credit bureau record.[10] In a lengthy 3–page letter dated November 9, 2000, Plaintiff rejected this offer, and urged Defendant to promptly propose a better settlement, "especially since there is a Statu[t]e of .Limitations involved." (Defendant's Motion, Ex. 5.)

On December 18, 2000, Defendant's vice president of credit operations, Richard C. Ehrle, advised Plaintiff in writing that "after thorough research of our records we can find no indication that double billing occurred on this account." (Defendant's Motion, Ex. 6.)[11] Despite this, Ehrle stated that "[i]n an effort to settle this matter, we will clear the account balance of $3297.95 and delete the account record from the credit bureau." (*Id.*) Plaintiff again responded in a lengthy letter dated December 29, 2000, stating that the steps taken by Defendant were inadequate, and that "I would once again inform you and advise you to contact your Attorneys to settle this matter fairly and in addition to what your letter states as fast as possible." (Defendant's Motion, Ex. 5.)

---

**10.** Despite this settlement offer, Defendant apparently placed Plaintiff's account into collection at around this time, as Plaintiff has produced a collection notice she received from ACI Collections, Inc. on November 9, 2000 regarding her account with Defendant. (*See* Plaintiff's Response, Ex. I.)

**11.** To this day, Plaintiff is unable to point to conclusive evidence that any double-billing occurred. Rather, this allegation still rests on the coincidence of the same amounts appearing on the December, 1999 statements of her maiden-name and married-name accounts.

Throughout the period of this dispute, Plaintiff alleges that Defendant improperly reported her account to credit bureaus as delinquent, and that she suffered business losses as a result. Plaintiff states, for instance, that she applied for a $100,000 line of credit from Providian Financial in June of 2000 for use in her self-owned and self-operated business, ArtQuote International, but that her credit application was rejected in late June or early July of 2000, purportedly because her account with Defendant was listed as delinquent with the credit reporting agencies. Similarly, Plaintiff states that she was unable to pursue credit applications with Franklin Bank and Comerica Bank in July of 2000, out of fear that these financial institutions would review her credit report with its indication of delinquency. Finally, Plaintiff asserts that a business arrangement between Art-Quote and Cypher International fell through in February or March of 2001 as a result of her inability to obtain venture capital to underwrite her obligations.[12]

## III. *ANALYSIS*

### A. The Standards Governing Defendant's Motion

Through its present motion, Defendant seeks summary judgment in its favor pursuant to Fed.R.Civ.P. 56. Under this Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment. As stated in *Celotex:*

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy of cases, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact,

---

**12.** Plaintiff further contends that the stress of her dealings with Defendant either triggered or exacerbated the onset of Graves' disease in April of 2000, which resulted in the removal of her thyroid gland in May of 2000 and follow-up treatment since that time. Plaintiff has produced an affidavit from her endocrinologist, Dr. Michael Garcia, who diagnosed Plaintiff as suffering from stress-related Graves' disease, and who states that "the additional stress sustained by Ms. Burnstein as a result of the ongoing dispute with Defendants ... may have caused or contributed to or exacerbated her Graves' Disease." (Plaintiff's Response, Ex. K.)

but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

\* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

\* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989); *see also Nernberg v. Pearce,* 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in resolving Defendant's motion.

## B. Plaintiff's Notice of Alleged Billing Errors Cannot Be Deemed Inadequate as a Matter of Law.

Plaintiff has asserted a variety of claims arising under the provisions of the Fair Credit Billing Act ("FCBA"), 15 U.S.C. § 1666 *et seq.* This federal statute and its implementing regulations, known as "Regulation Z," 12 C.F.R. § 226.1 *et seq.*, set forth the procedures to be followed when a creditor receives notice from a consumer of an alleged billing error in the consumer's credit card account. In order for these procedures to be triggered, however, the consumer must provide the requisite written notice of a billing error. As one of the grounds for its present motion, Defendant contends that the notice given by

Plaintiff of alleged double-billing errors was insufficient as a matter of law to give rise to any obligations under the FCBA. The Court cannot agree.

Before addressing the merits of this argument, it is helpful to describe the overall scheme established under the FCBA and Regulation Z for resolving credit card billing disputes. As noted, this process begins when a consumer provides "written notice" of a "billing error." 15 U.S.C. § 1666(a); *see also* 12 C.F.R. § 226.13(b).[13] This written notice must be given within 60 days of receipt of the statement reflecting the error, and must:

(1) set[ ] forth or otherwise enable[ ] the creditor to identify the name and account number (if any) of the obligor,

(2) indicate[ ] the obligor's belief that the statement contains a billing error and the amount of such billing error, and

(3) set[ ] forth the reasons for the obligor's belief (to the extent applicable) that the statement contains a billing error.

15 U.S.C. § 1666(a); *see also* 12 C.F.R. § 226.13(b).

This written notice triggers various obligations on the part of the creditor. First, the creditor must send a written acknowledgment to the consumer within 30 days after receiving notice of an alleged billing error. *See* 15 U.S.C. § 1666(a)(A); 12 C.F.R. § 226.13(c)(1). Next, within two complete billing cycles or 90 days after receiving the consumer's notice, whichever is less, the creditor must either correct the billing error and inform the consumer of this correction, or provide written notice and explanation that, upon reasonable investigation, the creditor has determined

---

**13.** There is no question that double-billing would constitute a "billing error" under the FCBA, as it would be a "reflection on a statement of an extension of credit which was not made to the obligor," 15 U.S.C. § 1666(b)(1), and perhaps also a "computation error or similar error of an accounting nature of the creditor on a statement," 15 U.S.C. § 1666(b)(5).

that no billing error occurred. *See* 15 U.S.C. § 1666(a)(B); 12 C.F.R. §§ 226.13(c)(2), (e), (f).

Until the dispute is resolved, a creditor may not "tak[e] any action to collect the [disputed] amount, or any part thereof," 15 U.S.C. § 1666(a); *see also* 12 C.F.R. § 226.13(d)(1), and the "consumer need not pay" this amount, 12 C.F.R. § 226.13(d)(1). In addition, while the dispute is pending, a creditor "may not directly or indirectly threaten to report to any person adversely on the obligor's credit rating or credit standing because of the obligor's failure to pay" the disputed amount, and "such amount may not be reported as delinquent to any third party" until the creditor has fulfilled its statutory dispute resolution obligations and has given the consumer at least 10 days to pay any amount determined to be owed. 15 U.S.C. § 1666a(a); *see also* 12 C.F.R. § 226.13(d)(2).

As is evident from the foregoing recitation of the facts of this case, Defendant did not rigorously adhere to the statutory scheme for resolving alleged billing errors. There is no question, for example, that Defendant failed to provide written acknowledgment within 30 days after receiving Plaintiff's statement of claimed billing errors, and that Defendant did not give written notice within 90 days of its resolution, one way or the other, of the parties' billing dispute. Nevertheless, Defendant contends that these duties never arose, in light of Plaintiff's purported failure to trigger Defendant's statutory responsibilities by giving adequate notice of any alleged billing errors. In particular, Defendant

points to Plaintiff's letter of January 15, 2000,[14] and contends that this correspondence lacked sufficient detail, as to amounts or specific transactions, to qualify as proper notice under the FCBA and Regulation Z.

██ The Court finds that the present record does not dictate this conclusion as a matter of law. First, the general nature of Plaintiff's claim of billing error is set forth with reasonable clarity in her January 15 letter: she declares her "discover[y] that Saks Fifth Avenue had been double billing [her maiden-name and married-name] accounts for four years," where "on statement(s) the same amount had show[n] up on both accounts." (Defendant's Motion, Ex. 5.) This statement provided a fairly limited description of the sorts of potential billing errors that Defendant might wish to explore—namely, only those instances where Plaintiff's maiden-name account statements included entries in the same amount as appeared on the statements for her married-name account, presumably within a short time span.

Moreover, Defendant's investigation seemingly would have been even more narrowly circumscribed, at least under the record presented to the Court. Plaintiff testified at her deposition that she ceased making any purchases under her maiden-name account after getting married in 1996, and that she did not receive any statements for this account between 1996 and December of 1999.[15] This December, 1999 statement has been placed into the record, and reflects only two purchases in mid-November of that year. Presumably,

---

14. The parties apparently agree that this letter is the only possible candidate for the written notice required under the FCBA, as Plaintiff's prior communications with Defendant were either verbal or informal, in the form of faxes of additional information requested by Defendant's customer service representatives.

15. Although defense counsel alluded at Plaintiff's deposition to certain statements that apparently reflect purchases and payments on Plaintiff's maiden-name account between 1997 and October of 1999, no such statements have been provided to the Court. Thus, nothing in the record casts doubt on Plaintiff's testimony regarding the maiden-name account.

then, if Plaintiff's deposition testimony is credited, the information she faxed to Defendant's customer service representatives in advance of her January 15, 2000 letter could only have consisted of the December, 1999 statement for the maiden-name account, plus any materials she might have retained with regard to her married-name account. This would have left Defendant to investigate only two possible instances of double-billing.

Admittedly, Plaintiff's January 15 letter does not set forth the precise amount of the claimed billing errors, as arguably called for under the FCBA and Regulation Z. Again, however, if one reads the January 15 letter in conjunction with the remainder of the record, there seemingly would have been very little room for doubt as to at least the approximate extent of the error claimed by Plaintiff. In light of Plaintiff's testimony that she had not used her maiden-name account for years, and given the statement in her January 15 letter that "Saks Fifth Avenue had been double billing [her] accounts for four years," it seems fairly evident that Plaintiff disputed the entire outstanding balance of her maiden-name account.

More importantly, both the FCBA and Regulation Z contemplate that a consumer may not possess all of the information necessary to precisely identify the extent of a claimed billing error. The regulation provides that the requisite written notice from the consumer must, *"[t]o the extent possible,* indicate[ ] the consumer's belief and the reasons for the belief that a billing error exists, and the type, date, and amount of the error." 12 C.F.R. § 226.13(b)(3) (emphasis added). In addition, both the statute and the regulation define a "billing error" as encompassing a "reflection on a statement of an extension of credit *for which the obligor requests additional clarification* including documentary evidence thereof." 15 U.S.C. § 1666(b)(2) (emphasis added); *see also* 12 C.F.R. § 226.13(a)(6). Thus, a request for clarification may itself constitute a "billing error" that triggers the procedural framework for resolving billing disputes. A consumer plainly might face some difficulty in ascertaining the precise amount of such an "error."

Viewing the January 15 letter and the remainder of the record in a light most favorable to Plaintiff, the Court finds that the letter could be read as providing notice of this latter type of "billing error." Plaintiff testified at length as to her discussions with "Shelby" in Defendant's customer service department, and stated that she was advised by this individual to place her entire maiden-name account into a disputed status, as it was possible that "there could have been double billing errors over the last four years." (Defendant's Motion, Ex. 3, Plaintiff's Dep. at 41–42.) Plaintiff seemingly followed this advice in her January 15 letter, stating that a double-billing error had been discovered on December 29, 1999, the date of her telephone conversation with Shelby, and that she believed that Defendant "had been double billing [her] accounts for four years." Her letter also references the documentation she had faxed to Shelby on December 29. Finally, the January 15 letter complains that Defendant's representatives had not followed up as promised during the December 29 telephone call. All of this could reasonably be read as a request for clarification and supporting documentation as to whether some or all of the outstanding charges on Plaintiff's maiden-name account might also have been billed to her married-name account.[16]

---

16. Plaintiff's subsequent correspondence with Defendant lends support to this interpretation, as she repeatedly complains that

Defendant had not provided her with the in-

Finally, the Court notes that Defendant's claim of lack of notice rings somewhat hollow in this case, where no contemporaneous evidence suggests that the investigative efforts of Defendant's account representatives suffered for want of information about the nature and extent of the billing error claimed by Plaintiff. There is no record, for instance, of any correspondence from Defendant to Plaintiff expressing uncertainty as to what sort of errors Plaintiff had alleged or seeking clarification as to these allegations. To the contrary, Defendant's first written statement to Plaintiff, the October 11, 2000 letter from account representative Maria Cobar, accurately characterizes Plaintiff's complaint as involving double-billing, and reports that Defendant was unable to identify any occurrences of this sort of error. The fact that one of Defendant's account representatives was able to investigate Plaintiff's claim strongly suggests that Plaintiff provided adequate notice of this claim.[17]

The utility of the FCBA's dispute resolution scheme would be greatly diminished if a creditor could simply throw up its hands and opt out of the statutory process upon encountering any ambiguity or lack of specificity in a consumer's claim. Indeed, a creditor cannot fairly complain that it might be forced to act upon incomplete information, because the FCBA provides a "safe harbor"—the creditor need only make a reasonable attempt to construe the consumer's complaint, investigate the claim so construed, and report back to the consumer within 90 days as to the merit of this apparent claim. There is, in other words, no penalty for "wrong guesses" made in good faith; the federal statute establishes only the procedural framework for dispute resolution, and does not concern itself with the substantive outcome of this process. Viewing the circumstances of this case in light of this statutory scheme, the Court is unwilling to say as a matter of law that Plaintiff's written notice of her claim failed to satisfy the letter or the spirit of the FCBA.

## C. Some But Not All of Plaintiff's Claims Are Barred by the Governing One–Year Statute of Limitations.

As the next basis for its motion, Defendant argues that Plaintiff failed to timely commence this suit within a year after Defendant's alleged violations of the FCBA, as required under the statute. *See* 15 U.S.C. § 1640(e).[18] The Court agrees

---

formation she had requested from the outset regarding her two accounts.

**17.** The Court recognizes that it must proceed with a degree of caution in evaluating Plaintiff's January 15 letter by reference to other evidence in the record. The FCBA, after all, expressly requires that a consumer provide written notice of a billing error, and this Court ought not altogether relieve a consumer of this statutory obligation through overly broad notions of "constructive notice," or by sifting through the record to determine whether some contemporaneous verbal communication might serve to fill the informational gaps in the consumer's written notice. In this case, however, Plaintiff has somewhat assuaged this concern by making express reference in her January 15 letter to other written materials she recently had provided to

Defendant's customer service representatives, and Defendant has not denied that it received such information from Plaintiff along with her letter. Under these circumstances, the Court believes it appropriate to look beyond the four corners of the written notice to a limited extent, at least for the purpose of determining whether the larger record tends to support the consumer's theory as to the adequacy of the written notice. In addition, it is important to recall that the requisite notice typically has been prepared by an ordinary consumer, and not a lawyer, so that it would be inappropriate to judge a consumer's submission by the standards of, say, a formal pleading.

**18.** This statutory provision, and its one-year statute of limitations, expressly applies to claims that a creditor has failed to comply

in part and disagrees in part.

Two of Plaintiff's claims clearly are time-barred. As noted, the FCBA requires that a creditor provide written acknowledgment within 30 days after receiving notice of a claimed billing error, *see* 15 U.S.C. § 1666(a)(A), and that the creditor resolve the billing dispute, whether favorably or unfavorably to the consumer, within 90 days after receiving notice of it, *see* 15 U.S.C. § 1666(a)(B). Plaintiff gave notice of her claimed billing errors on January 15, 2000. It follows that Defendant was obligated to acknowledge these claims on or before February 15, 2000, and to resolve them by April 15, 2000. Plaintiff's right of action as to these violations arose on these two dates, and she was required to bring suit as to these violations within a year of these dates. She did not do so, but instead commenced this action on June 1, 2001. Consequently, Plaintiff's claims arising from Defendant's violation of the 30–day and 90–day requirements of § 1666(a) are time-barred.

■ In arguing against this result, Plaintiff appeals to the "continuing violation" doctrine, and cites an unpublished decision, *Steimel v. Trans Union Corp.*, 1988 WL 46247 (E.D.Pa. May 10, 1988), which applies this doctrine in the context of the FCBA. This argument is unavailing, however, where there was not, and could not have been, any "continuing" violation by Defendant of § 1666(a)'s 30–day and 90–day requirements. Rather, Defendant's procedural violations were complete as of the dates that these deadlines passed.

*Steimel* itself illustrates this distinction, applying the "continuing violation" theory to a claim that a creditor failed to properly report the resolution of a billing dispute, but *not* to a claim that the creditor failed to meet the 90–day deadline set forth in § 1666(a). *See Steimel,* 1988 WL 46247, at *2–*3. The Court reasoned that the former obligation was ongoing, so that the failure to satisfy it was continuing, but that a failure to comply with the 90–day requirement was a discrete violation that occurred on a date certain. This Court, likewise, finds that procedural violations of the dispute resolution timeline established in § 1666(a) are discrete in nature, and that a right of action for such a violation accrues once the statutory deadline has passed.

■ Plaintiff's remaining claims under the FCBA likewise rest upon allegations of discrete violations. She alleges that Defendant violated § 1666(a) by instituting collection efforts on amounts that remained in dispute, and that Defendant violated § 1666a(a) by reporting these amounts to credit bureaus as delinquent while the parties' dispute was still pending. Plainly, such violations would occur, and a right of action would accrue, on the dates that Defendant took these actions, and Plaintiff would have a year from those dates to bring a suit based on these violations.

The record largely fails to conclusively establish the dates upon which each of these alleged violations occurred.[19] Re-

with the requirements of the FCBA. *See* 15 U.S.C. § 1640(a). Again, it bears emphasis that the FCBA's protections are procedural, not substantive. Consequently, and as discussed in greater detail below, the one-year period of limitation begins to run when the creditor fails to comply with the statutory scheme for resolving billing disputes, and not when, for example, the creditor commits a billing error that triggers the dispute resolution process.

19. In fact, it is not clear whether Defendant seeks to challenge the timeliness of Plaintiff's claims arising from Defendant's collection efforts and reports to credit bureaus. It appears that Defendant's motion is limited to the claimed violations of the 30–day and 90–day requirements of § 1666(a).

garding Defendant's collection efforts, it appears from Plaintiff's own deposition testimony that one of these was commenced in March of 2000, when Plaintiff was contacted by Tom Kelly of Defendant's collections department and advised that her account had been placed into collection status. (*See* Defendant's Motion, Ex. 3, Plaintiff's Dep. at 46.) Accordingly, the one-year statute of limitations had run on any claim arising from this alleged violation before Plaintiff brought this suit in June of 2001.[20] It also appears, however, that another collection effort was commenced in the fall of 2000, where Plaintiff has produced a letter she received from a collection agency on November 9, 2000. A claim arising from this alleged violation would not be time-barred.

Similarly, regarding any claimed violations of § 1666a(a) by reporting disputed amounts as delinquent, the record lacks sufficient detail to ascertain precisely when such alleged violations might have occurred. Plaintiff has testified that she learned of one such report in late June or early July of 2000, when her application for a line of credit from Providian Financial was rejected as a result of a delinquency notice in her credit report. Her claim arising from this alleged violation was timely asserted within a year of this event. The record is silent, however, as to whether and when Defendant might have made any other reports to credit bureaus.[21] Accordingly, the Court cannot determine as a matter of law whether any claims arising from such occurrences would be time-barred.

## D. Some But Not All of Plaintiff's Items of Damages Are Recoverable.

As the final ground for its motion, Defendant challenges several of Plaintiff's claimed items of damages. The Court finds that many, but not all, of these challenges are well-founded.

Under the FCBA, a successful plaintiff may recover for "any actual damage sustained ... as a result of" a violation. 15 U.S.C. § 1640(a)(1). In addition, the plaintiff is entitled to recover "twice the amount of any finance charge in connection with the transaction,"[22] and also "the costs of the action, together with a reasonable attorney's fee as determined by the court." 15 U.S.C. §§ 1640(a)(2)(A)(i), (a)(3). The parties' principal debate at the moment concerns the "actual damages" claimed by Plaintiff. Accordingly, the Court turns to this issue.

**20.** The Court notes that the one-year period of limitation set forth in § 1640(e) is subject to equitable tolling. *See Jones v. TransOhio Savings Ass'n,* 747 F.2d 1037, 1042 (6th Cir. 1984). Yet, Plaintiff's professed knowledge of Defendant's March, 2000 collection effort seemingly precludes any appeal to equitable tolling as to this alleged violation. More generally, Plaintiff's repeated references in her letters to the dictates of federal law, and her express statement in her November 9, 2000 letter that "there is a Statu[t]e of Limitations involved," make it difficult for her to claim any unfair surprise in the running of the statute.

**21.** The outer bound for such claims presumably would be December 18, 2000, when Defendant advised Plaintiff that it was clearing the outstanding balance on her account and deleting the delinquency notice from her credit record. Plaintiff has not produced any evidence that Defendant failed to take these actions as promised.

**22.** In this case, Plaintiff apparently never paid any such finance charges, as Defendant cleared them along with the rest of the outstanding account balance in December of 2000. Nevertheless, there is authority for the proposition that these charges are recoverable as a statutory penalty for the creditor's failure to comply with the terms of the FCBA. *See Belmont v. Associates Nat'l Bank (Delaware),* 119 F.Supp.2d 149, 164–65 (E.D.N.Y.2000). The Court declines to decide whether to adopt this position, as the parties have not addressed the matter in their briefs.

■ Defendant challenges the evidentiary foundation for several of Plaintiff's items of actual damages. First, regarding Plaintiff's claims of losses to her business, ArtQuote International, as a result of her inability to secure financing, Defendant argues that certain of these claims are impermissibly speculative in nature, and that others fail for lack of causation.[23] As instances of the former, Defendant points to Plaintiff's inability to obtain credit from Franklin Bank and Comerica Bank in July of 2000. Plaintiff conceded at her deposition that she never completed the process of applying for credit from these financial institutions, because she was unwilling to disclose her credit report with its notice of a purported delinquency in her account with Defendant. Defendant contends, and the Court agrees, that a trier of fact would have to engage in an impermissible degree of speculation to find that a blemish on Plaintiff's credit report would have led Franklin Bank and Comerica Bank to deny her applications for credit, where Plaintiff herself short-circuited this process by withdrawing her requests from consideration.[24]

■ The Court further agrees with Defendant that a causation problem defeats Plaintiff's claim for damages arising from the demise in February or March of 2001 of a joint business venture between ArtQuote and Cypher International. Plaintiff has testified that this relationship failed as a result of her inability to secure venture capital. Yet, as Defendant points out, Plaintiff's credit record was cleared in mid-December of 2000, and Plaintiff has offered no evidence suggesting otherwise. Thus, any failure to secure venture capital in early 2001 cannot be attributed to any antecedent FCBA violation by Defendant.

■ Defendant next challenges Plaintiff's attempt to recover for her treatment for Graves' disease in April and May of 2000. The Court agrees that these damages are not recoverable, albeit not for the reason cited by Defendant.[25] This disease necessarily could only have been triggered or exacerbated by FCBA violations that occurred *prior* to its onset in the spring of 2000. Yet, as explained earlier, any claims arising from such violations are time-barred, where Plaintiff commenced this action more than a year later. It follows that Plaintiff may not recover damages for any such violation.

Finally, Defendant argues that an award of "actual damages" under the FCBA does not encompass Plaintiff's claims of emo-

---

**23.** The Court notes another potential problem in Plaintiff's effort to recover for losses allegedly sustained by ArtQuote International. This business apparently is organized as a limited liability corporation, and Plaintiff ordinarily would not face individual liability for debts incurred by the company. It does not necessarily seem appropriate, then, that Plaintiff should collect individual damages for business gains that were anticipated but not realized, as any such losses belong to the corporation. If corporate formalities are to be respected, the separation between individual and corporation must be complete, and not a one-way street. However, the parties have not briefed this issue, and the Court elects not to resolve it at this time.

**24.** This still leaves, however, any actual damages Plaintiff can establish that she sustained as a result of the denial of a line of credit by Providian Financial in June of 2000. As to this transaction, Plaintiff has produced evidence from which it could be concluded that this denial was due to Defendant's improper reporting of a still-disputed amount as delinquent.

**25.** Defendant argues that this disease could not have been brought about or exacerbated by any collection efforts, as Plaintiff purportedly did not receive notice of any such efforts until July of 2000. This contention is refuted, however, by Plaintiff's testimony that she was contacted by Tom Kelly in March of 2000 and told that her account had been placed into collection.

tional distress, embarrassment, and humiliation. There is, unfortunately, very little authority on this subject. In arguing that such damages are recoverable, Plaintiff points to the unpublished decision in *Butler v. Sterling, Inc.*, 210 F.3d 371, 2000 WL 353502 (6th Cir.2000). There, the Sixth Circuit stated in dicta that a "persuasive argument exists" for such a rule, and that "[n]othing in the plain language of section 1640(a)(1) precludes awarding consequential damages, including damages for severe emotional distress," particularly in light of the "consumer friendly" nature of the statute. *Butler*, 2000 WL 353502, at *8. The Court also noted the Second Circuit's ruling in *Casella v. Equifax Credit Information Servs.*, 56 F.3d 469, 474 (2d Cir.1995), that mental distress damages are recoverable under the analogous "actual damages" provision of the Fair Credit Reporting Act. The Sixth Circuit then observed, however, that such damages likely would be available only in "extreme cases" involving "considerable embarrassment or humiliation," and the Court found that the "loss of trust" cited by the plaintiff in that case "would not be enough to sustain a request for damages due to emotional distress." *Butler*, 2000 WL 353502, at *8–*9.

■ This Court, like the Court in *Butler*, finds it unnecessary to definitively state whether emotional distress damages are recoverable as "actual damages" under the FCBA, because the record in this case does not disclose "extreme" circumstances or "considerable" mental distress that might warrant such an award. Virtually all of the alleged emotional injury identified by Plaintiff arises from her concern that her business reputation, rather than her personal reputation, would suffer on account of the delinquency noted on her credit record. Apart from her time-barred claim regarding her Graves' disease, Plaintiff has not produced evidence of any tangible physical effects of her alleged stress, and it does not appear that she sought any form of mental health treatment. Nor has Plaintiff identified any egregious behavior by Defendant's account representatives that could be expected to give rise to emotional distress; the record suggests that their conduct could more accurately be characterized as inattentive than outrageous.

Indeed, even as to Plaintiff's fears of business losses and resulting embarrassment, the evidence indicates that these fears were more anticipated than realized. As noted, many of Plaintiff's efforts to obtain credit for the benefit of her business were defeated by her desire to *avoid* the embarrassment of disclosing a tainted credit report. *Cf. Casella*, 56 F.3d at 475 (rejecting the plaintiff's contention that he was entitled to emotional distress damages "simply because he *knew* of an inaccurate and potentially damaging item in his credit report"). Although she was denied credit on one occasion, nothing in the record takes this out of the realm of the ordinary ups-and-downs of running a business. Absent any concrete evidence of emotional injury, Plaintiff has not produced a sufficient record of credit denials, ongoing dealings with creditors, or similarly stressful situations that might warrant the presentation of this question to the trier of fact.

## IV. *CONCLUSION*

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's November 7, 2001 Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, in accordance with the rulings set forth in this Opinion and Order.